**UNITED STATES of America, Plaintiff,**

v.

**Dannie E. KREPS, also known as Maynard Kreps, et al., Defendants.**

**No. 71–CR–8.**

United States District Court, W. D. Wisconsin.

Oct. 12, 1972.

John O. Olson, U. S. Atty., Madison, Wis., for plaintiff.

Melvin F. Greenberg, Madison, Wis., Henry M. di Suvero, New York City, Leonard I. Weinglass, Newark, N. J., for defendants.

OPINION AND ORDER ON MOTION BY DEFENDANTS REGARDING ALLEGED FAILURE TO AD–VISE DEFENDANT KREPS OF RIGHTS BEFORE GRAND JURY

JAMES E. DOYLE, District Judge.

The defendants have moved for an order quashing the indictment as to all of them on the ground that testimony was improperly elicited from defendant Kreps when he appeared before a grand jury in this district. The parties have stipulated to the truth of those facts appearing immediately hereinafter under the heading "Stipulated Facts", and I find them as facts.

STIPULATED FACTS

On July 29, 1970, Kreps was interviewed by agents of the Federal Bureau of Investigation. He was advised of his constitutional rights against self-incrimination, and he signed a statement entitled "Waiver of Rights." At that time, no mention was made of any grand jury investigation. By August 7, 1970, the United States Attorney knew that Kreps had been confined to Camp McCoy by military authorities, who were then investigating his role in certain bombings that had occurred at the Camp on July 26, 1970; and that agents of the F.B.I., in applying for warrants to search the bus belonging to Thomas Chase, had averred that Kreps had spoken to several people, expressing an intention to bomb some buildings at Camp McCoy, and had requested one of these people to make him a bomb. By November 3, 1970, the United States Attorney was aware that the search of the Chase bus had turned up no incriminating evidence against Kreps. On December 3, 1970, Kreps appeared before the grand jury, accompanied by counsel. The counsel accompanying Kreps on that date knew that Kreps had been confined to Camp McCoy by military authorities, in connection with his alleged role in the bombings of July 26, 1970, and had represented Kreps in a habeas corpus action in Federal Court, brought to challenge the legality of that confinement. At the time of his appearance before the grand jury, Kreps had not been charged with the commission of any crime. Prior to Krepps' testimony, the United States Attorney asked Kreps if his attorney had

advised him regarding his appearance and testimony before the grand jury. At no time, either prior to or during the course of his testimony, was Kreps told that he was a subject of the grand jury investigation, nor was he advised of his right to remain silent, nor requested to sign a waiver of immunity. The transcript attached to "defendant's reply to government's response in opposition to defendants' motion to dismiss indictment on fifth amendment grounds" covers the entire appearance of Kreps before the grand jury.[1]

From the transcript of the grand jury proceedings and from the court records, I also find as facts those facts appearing hereinafter under the heading "Additional Facts."

## ADDITIONAL FACTS

On or about August 7, 1970, affidavits by two government investigators were submitted to a United States Commissioner in support of an application for a warrant to search a Volkswagen bus belonging to now defendant Chase. These affidavits are briefly referred to in the stipulated facts, above. The affidavits related to the explosions at Camp McCoy on July 26, 1970, indicating that the explosions occurred at about 3:30 a. m. The affidavits summarized information obtained from informants to the effect that Kreps had said he was going to bomb some buildings at Camp McCoy; that Kreps had engaged in a conversation with Chase and Geden, thought to relate to bombing plans; that the Chase Volkswagen had been seen at certain places and times thought to be significant in connection with the bombing; that Kreps had spoken of a theft of dynamite from a quarry; that on the morning of July 26, Kreps had asked for and obtained the use of a vacuum cleaner near a place where the Chase Volkswagen was parked; that some time prior to July 26, Kreps had said to a specified person "make me a bomb" or words to that effect; that in the company of Chase, Geden, and another specified person, there had been discussion on about July 6, 1970, to the effect that it would be a good idea to blow something up at Camp McCoy, and on July 24, 1970, that there had been conversation about explosives and a rock quarry.

Prior to coming to the grand jury room on December 3, 1970, Kreps had consulted with the counsel who accompanied him on that day, and counsel had advised him regarding his appearance before the grand jury. During the morning of December 3, 1970, before the grand jury, under oath, commencing at 10:40 a. m., Kreps was questioned extensively about his associations at Camp McCoy and in the nearby city of LaCrosse, particularly with Chase and Geden. Kreps was questioned about whether he had ever discussed blowing up facilities at Camp McCoy, whether he had ever made inquiries about any one building a bomb, whether he had ever made inquiries about where he could get dynamite, whether he had mentioned to a certain person a theft of dynamite, and whether he and Chase and Geden had ever discussed the neces-

---

1. Defendants object, on the grounds of relevancy, to the following portion of said facts:

On July 29, 1970, Kreps was interviewed by agents of the Federal Bureau of Investigation. He was advised of his constitutional rights against self-incrimination, and he signed a statement entitled "Waiver of Rights". By November 3, 1970, the United States Attorney was aware that the search of the Chase bus had turned up no incriminating evidence against Kreps. The counsel accompanying Kreps on [December 3, 1970] knew that Kreps had been confined to Camp McCoy by military authorities, in connection with his alleged role in the bombings of July 26, 1970, and had represented Kreps in a habeas corpus action in Federal Court, brought to challenge the legality of that confinement. Prior to Kreps' testimony [before the grand jury], the United States Attorney asked Kreps if his attorney had advised him regarding his appearance and testimony before the grand jury.

The objection is overruled.

sity of getting something going before the National Guard left Camp McCoy, and he gave answers to those questions. At about 11:05 a. m., the United States Attorney inquired of Kreps whether he wished to talk with his lawyer, Kreps agreed, and a recess was taken for this purpose. Thereafter, Kreps was questioned in detail about his movements and those of Chase on the evening of July 25, the early morning of July 26, and the later morning of July 26, including questions about the movements of the Volkswagen bus and about vacuuming the Volkswagen bus, and he answered. Shortly before 11:30 a. m., when asked whether anyone had ever told him that they had information about the explosions, he declined for the first time to answer a question, stating that his answer might incriminate him. He declined to answer several similar questions, on the same ground. When the session resumed at 1:30 p. m., after recessing at 11:30 a. m., Kreps again invoked his privilege against self-incrimination several times, and then resumed giving answers to further detailed questions concerning his movements and those of defendant Chase on the night and morning in question. Kreps was excused by the grand jury at 1:50 p. m.

On February 11, 1971, the grand jury returned the present indictment against him, Chase, and Geden.

### OPINION

In United States v. Cefalu, 338 F.2d 582, 584 (7th Cir. 1964), it was held that it is permissible to compel even a "probable defendant" to appear before a grand jury and to submit to questioning: ". . . [T]he privilege accorded one called before a grand jury is the election to refuse to give testimony which might tend to show he had committed a crime."

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, was decided in 1966. In Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), the Miranda rule was applied to an interrogation by a federal revenue in-

vestigator, because the interrogation occurred in a state prison in which the subject was incarcerated for reasons unrelated to the federal tax matters.

In United States v. DiGiovanni, 397 F.2d 409, 412 (7th Cir. 1968), cert. den., 393 U.S. 924, 89 S.Ct. 256, 21 L.Ed.2d 260 (1968), it was held that the government's failure to give Miranda warnings "to a grand jury witness, even one as to whom the proceedings have become accusatory, does not bar a perjury prosecution for false testimony before the grand jury." However, the court expressly noted that it was not presented with a situation in which: "an actual or potential defendant is called before a grand jury and, in the absence of the warnings, makes incriminating admissions [citing Mathis generally]. We are therefore not called upon to determine the application of Escobedo v. Illinois [378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964)] and Miranda v. Arizona to admissions made by grand jury witnesses."

I hold that one as to whom criminal proceedings have become accusatory is entitled to some measure of protection of his privilege against self-incrimination when he appears before a grand jury. The questions here are whether the proceedings had become accusatory as to Kreps to a degree that entitled him to a measure of protection; if so, what was the minimal measure of protection; whether he received this minimal protection; and if not, what legal consequences should follow.

The government sharply disputes that the proceedings were accusatory as to Kreps as of the time of his appearance before the grand jury. It argues that when the search of the Chase bus proved unproductive, it had no case against Kreps.

The government contends that it did not again regard Kreps as a suspect until more than an hour after Kreps had completed his testimony, when another witness volunteered previously unknown information which implicated Kreps in

the bombing; thereafter, the investigation began to focus on Kreps as well as on others. Evidence on this point has not been received, and the government has not been provided with an opportunity to present it, if it were to elect to do so. I have made no findings on these precise points. Under the view I take of the matter, it is unnecessary to do so. Of course I would be disposed to accept the representations of the United States Attorney on these points. But even if I were to do so, I could not decide the question in terms of his state of mind. In my view, my decision must be based upon the objective record of what had occurred with respect to Kreps earlier and what occurred when he appeared before the grand jury.

█ On this objective record, it is very clear that as of August 7, 1970, Kreps was a prime suspect. I appreciate that the search of the van apparently produced nothing to strengthen the case against him. But this circumstance did nothing to alter the information about Kreps which had previously been gathered. It is also very clear that the questioning of Kreps before the grand jury, from beginning to end, was directed to his possible direct involvement and not solely to his possible knowledge of others' involvement.

I find and conclude that as of the time he appeared before the grand jury, the proceedings had become sufficiently accusatory as to Kreps to require that he receive some measure of protection.

The government contends that, even under this view of the matter, Kreps was adequately protected because he was accompanied to the courthouse on the day of his grand jury appearance by a lawyer who was aware that Kreps had been suspected of involvement in the bombing; because Kreps was asked at the outset of his testimony whether he had been advised by his attorney concerning his grand jury appearance and answered that he had been advised; because a recess was called, on the government's initiative, after about 25 minutes of questioning, to permit Kreps to consult with his attorney; and because a two hour luncheon recess occurred shortly after the 11:05 recess ended and before the afternoon questioning occurred.

The government's basic contention is that the opportunity to consult a lawyer prior to one's appearance before the grand jury, and to have the lawyer available outside the grand jury room for consultation from time to time during the questioning, is sufficient protection of the privilege against self-incrimination even for one as to whom the proceedings have become accusatory. The contention is not unreasonable, but I cannot accede to it. It would be a simple prophylactic rule, easily complied with, that before grand jury testimony is elicited from one in Kreps' position, the *Miranda* warnings be given.

The government suggests that such a rule would place extravagant emphasis upon the "technicality" of *Miranda* warnings. Of course, such warnings, whenever and wherever given, can be given in such a manner as virtually to negate their function. But in such matters, we must assume the best, not the worst, about law enforcement personnel. We must assume that once it has been held that the warnings must be given in certain repetitive situations, they will be given carefully and seriously, in such a manner that they are understood. I cannot say that to receive such a warning would be a small matter for one brought before a grand jury. The setting is forbidding. The circumstances are totally one-sided; only the prosecutor is present with the witness and the grand jury. Even when counsel is available outside the grand jury room, he and his client cannot fully anticipate the directions which the interrogation may take.

I do not think it will do to assume, from the presence of a lawyer in the witness' company when they reach the courthouse, that the witness has been given the *Miranda* warnings by the lawyer. In some situations, in which the lawyer has been retained well before the

time of the grand jury appearance and in which the lawyer knows that his client is vulnerable to indictment, the inference would be reasonable. But this would require case-by-case, factual inquiry into the duration and nature of the lawyer's knowledge of the situation. Indeed, in the case at hand, the government has suggested that the lawyer be called upon to answer, under oath, whether he gave the Miranda warnings. Such an inquiry would be unseemly, and in the course of it, delicate questions might well arise with respect to the client's privilege. The need to draw inferences, the need to inquire into the duration and extent of the lawyer's connection with the matter, the need to interrogate the lawyer, all these can be avoided by a simple rule. The reasons for such a rule have been well stated in a somewhat different context in United States v. DiGrazia, 213 F.Supp. 232 (N.D.Ill.1963). I conclude that the rule should be adopted, and that the warnings should have been given to Kreps by the prosecutor at the outset of his testimony.

Of course, if Kreps had actually declined to answer any significant questions, invoking his privilege, the failure to warn him would have been without consequence. But in fact he responded to intensive and extensive questioning on matters at the heart of the case. He did not say that he had performed the acts of which he is now accused. But among many other things, he acknowledged his presence with Chase at the time of the bombing, and his presence in the Volkswagen bus which is apparently thought to have played a significant part in the events. The government contends that if any consequence is to flow from the failure to warn, it should be limited to excluding from evidence Kreps' grand jury testimony. I cannot agree that this is a sufficient consequence. The task of administering the "fruit of the poisonous tree" doctrine in such a situation would be difficult in the extreme. But more important, under the Constitution, Kreps could not have been proceeded against in the absence of indictment. We are left wholly to speculation whether the grand jury's decision to indict Kreps was affected in significant degree by the testimony he gave in its presence.

 Defendants Chase and Geden contend that if the indictment is dismissed as to Kreps, it must be dismissed as to them as well. I am not persuaded that they have any standing to claim such relief on the ground that another person was denied a right which was his.